COURT OF APPEALS OF VIRGINIA

Present:  Judges Beales, O'Brien and Russell
Argued by videoconference

PUBLISHED

HORACIO EUGENIO SOBOL

v.      Record No. 0459-21-4

CHRISTINE MARIE SOBOL

OPINION BY
JUDGE WESLEY G. RUSSELL, JR.
JANUARY 25, 2022

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Dontaè L. Bugg, Judge

Christopher Malinowski (Melanie Hubbard; Jenni S. Tynes;
Malinowski Hubbard, PLLC, on briefs), for appellant.

David L. Ginsberg (Sarah L.W. Peritz; Cooper Ginsberg Gray,
PLLC, on brief), for appellee.

Horacio Eugenio Sobol (husband) and Christine Marie Sobol (wife) were divorced by a

final decree that, in addition to granting the parties a divorce, provided for the equitable distribution

of their property.  On appeal, husband challenges the trial court's valuation and distribution of

certain assets, its order requiring him to designate wife as a beneficiary of a life insurance policy,

and its award of attorney fees to wife.  For the reasons that follow, we affirm in part, reverse in part,

and remand for further proceedings consistent with this opinion.

BACKGROUND[1]

The parties were married in August 1998 and separated approximately twenty years later, on

July 1, 2018.  Three children were born of the marriage.

---

[1] On appeal, "we view the evidence in the light most favorable to the prevailing party, granting it the benefit of any reasonable inferences." *Mills v. Mills*, 70 Va. App. 362, 368 (2019) (quoting *Kahn v. McNicholas*, 67 Va. App. 215, 220 (2017)).  We accordingly review the record in the light most favorable to wife.

Wife had earned a bachelor's degree in business administration and was completing her master's degree in international business when she married husband. Wife worked full-time for most of the first half of the marriage; she took breaks after giving birth to her first two children and ultimately ceased full-time employment in 2009, when she was pregnant with the third child. She worked as a part-time consultant until 2014. During the marriage, wife inherited a substantial sum from her brother's estate.

Husband was employed throughout the marriage as a CPA with PriceWaterhouseCoopers (PWC), where he had started working in 1992. In the years leading up to and after the parties' separation, husband was reporting annual income averaging around $1 million. The parties maintained an affluent lifestyle; they were able to fund several investment accounts and to afford private schooling for their children and were able to enjoy vacations, concerts, and other entertainment events. Husband's earnings subjected him to a high rate of taxation: at trial, he testified that he paid a combined state and federal rate of approximately fifty percent.

Husband became a partner at PWC in 2006. His ownership interest encompassed a deposit capital account and an accrual capital account. He financed the purchase of his ownership interest with the assistance of a loan from the firm, and thus, his ownership interest was subject to the outstanding balance that remained on that loan. As of the separation, there was $231,100 in the deposit capital account, $133,181 in the accrual capital account, and a loan balance of $72,214; but as of the evidentiary hearing, the accrual capital account had increased to $275,699 and the loan balance had been reduced to around $55,000. Husband does not presently have access to the accrual capital account; he will gain access when he retires. He will have to pay taxes on the amount he receives at that time.

As a partner, husband had his earnings deposited in a "partner deposit program account" established by the firm (PDP account). The account consisted of partnership distributions and

interest of five percent on the funds held therein.  At the date of separation, $630,336 was in the account.  After separation, money continued to be deposited into the account, most notably a deposit of $346,556 made on October 1, 2018.  At one point, the account contained over $1 million.  As of the date of the evidentiary hearing, however, only $116,372 remained in the account.  Post-separation, husband transferred funds from the account and used those funds for various purposes.  He testified that, among other things, he used the transferred funds to pay the mortgage on the marital home, various taxes, the parties' life insurance premiums and legal fees, and tuition and other expenses related to the children.

Husband's employment also entitled him to participate in the PWC Partner Retirement Plan (pension), which is designed to provide him continued income after retirement.  The firm requires husband to retire at age sixty, but he and wife had discussions with their financial advisor about the possibility of him retiring at fifty-five.  Provided the firm has sufficient assets at the time, the pension will afford husband an annuity upon his retirement.  It is otherwise an "unfunded" and "unqualified" plan that is not guaranteed and is not subject to division pursuant to a qualified domestic relations order.

Among the assets the parties acquired during the marriage were life insurance policies.  Wife had a policy with Northwestern Mutual, with a cash value of $197,540, while husband maintained a policy with MassMutual, which had a $327,494 cash value and $1 million death benefit.  Husband also obtained a MetLife policy through PWC that had a $4 million death benefit.  The Sobol Living Trust was the named beneficiary of each of the policies.

After separation, the parties entered into a collaboration participation agreement.  The parties retained counsel to assist them in an effort "to settl[e] the issues arising from the dissolution of their marriage . . . without adversarial court intervention."  The agreement called for "[p]reservation of the [s]tatus [q]uo" whereby the parties agreed not to

> sell, transfer, borrow against, . . . remove, or in any way dispose of any property . . . whether or not marital, . . . without the written consent of the other, except in the usual course of business consistent with past practice or for payment of . . . household expenses [or other] reasonable expenses consistent with the past practice of the family or for reasonable professional fees in connection with the Collaborative Process.

After commencing the divorce proceedings, wife filed a motion for an alternate valuation date for the PDP account. Based on the withdrawals husband had made post-separation, wife requested that the account "be valued prior to [h]usband's expenditure, withdrawal, or other transfer." She argued that "[t]he only way to achieve an equitable valuation and division of assets is to reconstitute the value of [PDP account] assets to include the amount of any and all funds withdrawn and/or expended by [husband]." Husband did not request an alternate valuation date for any of the PWC affiliated accounts to include those associated with his ownership interest.

A four-day trial was held in August 2020. The parties had resolved many matters prior to trial, but as pertinent to this appeal, issues related to husband's PWC ownership interest, his PDP account and pension, life insurance, and attorney fees remained in dispute. The trial court heard from the parties, their financial advisors, vocational rehabilitation experts, and a forensic accountant, and it received numerous documents related to the parties' financial circumstances.

Wife called Salvatore Ambrosino, an expert in forensic accounting and business asset valuation, to testify to the value of husband's ownership interest in PWC. He explained that the value was "equal to his capital account at June 30, 2020 based on the most recent information . . . provided[, which were the] capital balances and the capital outstanding loan balance as of 10/31/2019." Ambrosino determined that, in the "deposit capital account there was a balance of $231,100[,[2] i]n his

---

[2] Ambrosino defined the deposit capital account as "capital balances required by the firm for their partners and their amounts withheld from the partners to fund essentially the operation . . . of the firm, [as] determined by the governing committees for PWC" and for which husband has no discretion.

- 4 -

accrual capital account, there was [a] balance of $275,699 and offsetting that amount was an outstanding loan of $54,814, leaving a net amount of $451,985."

Ambrosino more specifically described the accrual capital account as "the untaxed balances of . . . essentially [husband's] income earned with the firm, less amounts attributed to him, the difference between his accrual basis income and his cash basis income based on the firm's accounting as of June 30, 2020." He further explained that "accrual income is income on an accrual basis[,]" essentially meaning "income that has been earned but has not yet collected[, while c]ash income would be actual cash receipts and disbursements[, which] . . . in this instance is the income that has been reported to him and for which he is charged – is taxable income."

During his testimony, husband confirmed the value of the deposit capital account. He recounted a loan balance of $72,214 at separation and reported that an automatic withdrawal of approximately $1,100 per month was continuing to be paid towards the loan from his post-separation earnings. In contrast to Ambrosino, husband valued the accrual capital account at $133,181, the amount it held as of the date of separation, even though he had not requested an alternate valuation date. He also testified that he would be taxed on funds in the accrual capital account when he received them upon leaving the firm. Assuming a base individual tax rate of 39.6% then adjusted to 40.1, a self-employment tax, and a "high income Medicare tax," husband estimated a total tax rate of 50.1%. By then multiplying 49.9% and $133,181, husband calculated the accrual capital account to be worth $66,457. He then calculated the total value of the "marital portion" of his PWC ownership interest to be $225,343.

Ambrosino also was questioned about husband's PDP account. He stated that the post-separation deposit of $346,555.78 was a PWC payroll deposit that constituted a "prior year final distribution." He opined that, although husband received the amount on October 1, 2018, "he earned it all as of June 30, 2018." Ambrosino also attempted to trace withdrawals from the account;

he noted that the majority were transfers to the parties' joint or husband's Bank of America account. Explaining that "this is a cash account so the funds once in there, . . . they're commingled," he also reported that "there were [a] limited number of withdrawals that we were not able to trace to either of those accounts[;]" he relayed that "$39,055 went out that we did not trace to either of those accounts." "Because there's a series of deposits and withdrawals and interest earned on the balance . . . and this is a cash account[,] . . . [i]t's fungible so there would be no way to determine which dollar came in, when and how that dollar was taken out of the account."

Husband explained that, because of restrictions on how much money he could hold in other accounts, much of his PWC earnings were deposited into the PDP account. Nevertheless, to access PDP account funds, the money first would have to be transferred to another account. Husband acknowledged the reduction in PDP account funds that had occurred between separation and trial, but stated that he was depositing his wages as well as withdrawing funds. With respect to the October 1, 2018 deposit of $346,555.78, husband stated that the amount was "partly [his annual distribution for fiscal year 2018] and partly a bonus." He confirmed that "the amount was determined as of June 30, 2018" but asserted that it was conditioned upon his "perform[ing] certain functions through September." Husband testified that the bonus amounted to $80,000.

Husband attempted to trace post-separation withdrawals from the account to payments for marital expenses, which he estimated to total $760,000. He testified that he had used $216,362 to pay off the mortgage on the marital home and had paid $7,406 in real estate taxes for the property. He further relayed that he had paid two tax installments of $78,600 and recounted an additional $154,000 in taxes as well as a $36,500 life insurance premium payment. Husband also claimed roughly $10,000 in payments for professional services procured as part of the collaborative process. His evidence also indicated over $50,000 spent for tuition for the children.

With respect to husband's pension, Ambrosino explained that "[i]t's an unfunded plan" whereby "once [partners] retire from the firm, depending on their age and years of service, they will receive a lifetime annuity from the firm." He emphasized: "It's a future benefit that he will receive only upon retirement." He expounded that there are "no assets put aside to fund this[; i]t comes from future earnings of the firm" so that "the payments to the retired partners come from the current income of the firm." Ambrosino contrasted the PWC pension with "qualified plans," which "are plans that are currently tax deductible by the firm or by the participants in terms of their contributions to the plan[,]" while "[h]ere, it's not funded. There's no set aside. There's no current deduction. It doesn't have current tax benefit to the partner."

Ambrosino opined as to "the net present value" of the pension. He testified: "Assuming [husband] continues to work [to the] normal retirement age of 60, . . . the net present value as of his vested benefits June 30, 2020 . . . [will] be $820,550." He based his opinion "on information . . . provided by the firm of his accrued vested benefit as of June 30, 2020, which . . . was $164,495 per year upon retirement at age 60" and on husband's "life expectancy from the table provided by the Virginia Code." Ambrosino then calculated "the $164,000 per year over that expected lifetime first, withdrawing an amount anticipated for taxes, because this benefit will be fully taxable to [husband] when received." Ambrosino applied "a rate of 46 percent for combined federal and state taxes[ a]nd then using the net benefit, . . . applied an interest rate of 3.9 percent and determined a present value for that annuity – or that payment stream." Upon questioning, Ambrosino confirmed that he had "calculated after tax benefits[;"] assuming that husband "would be in the highest tax bracket" and based on anticipated changes in the law, he applied a rate higher than the current one. He further noted that the retirement benefits may constitute only part of one's overall income.

Husband acknowledged that the pension was "something that's building there" but stressed that the pension was not a source of income and that "it's not guaranteed right now." He further

expressed his intent to retire at age fifty-five rather than at sixty. The parties stipulated to the use of a coverture fraction to account for the marital share of the pension and agreed that the numerator reflecting the time the benefit was accruing during marriage was 144 months. Although husband conceded wife would be entitled to fifty percent of the marital share, he argued in his closing statement to the trial court that the payments should not be divided until actually received by husband. He further contended that payments to wife should be reduced to compensate for the fact that husband would bear 100% of the tax liability on the annuity; in the alternative, he proposed that wife receive only 27.5% of the marital share.

Both parties testified about their life insurance policies. Wife relayed her preference that the cash values of their respective policies be equalized and stated her belief that the Sobol family trust was the beneficiary of her whole life insurance. She expressed that she did not want to maintain husband as a beneficiary going forward but wanted him to pay her premiums with the children being the ultimate beneficiaries. In contrast, she asked that she be a beneficiary of husband's policy "to the extent it covers a pension benefit." She further explained that she thought she should be the beneficiary of his policy while husband was not on hers because only he would be subject to a spousal support obligation.

Wife testified that she had incurred significant legal fees. She relayed that since the end of the collaboration process, around October 1, 2019, she had been paying her fees directly, using money from her *pendente lite* support. Wife submitted an affidavit attesting to the fees she had incurred. Husband submitted an affidavit attesting that he had incurred a total of $145,880.74 in legal fees based on his attorney billing approximately 386 hours of work. Husband argued against awarding wife any of the fees she had incurred.

After considering the evidence and the parties' closing briefs, the trial court announced its decision from the bench on January 21, 2021. The trial court noted, "As to equitable distribution,

the [c]ourt has considered each and every statutory factor included in § 20-107.3(E) as to which evidence was presented. . . . If I do not mention a factor it is not because it has not been considered."

Before distributing the parties' property based on the evidence related to those factors, the trial court determined the extent to which the property was marital or separate. As relevant here, the trial court included the PDP account and both the MassMutual and Northwestern life insurance policies among the property classified as marital. In contrast, the trial court classified husband's ownership interest in PWC and the PWC pension as "hybrid property or hybrid marital property."

The trial court then valued all the property. With respect to husband's ownership interest in PWC, the trial court found the value to be $434,585; the trial court reached this valuation by combining the value of the deposit capital account with the value of the accrual capital account and then subtracting the amount outstanding on the loan. In so calculating the total, the trial court accepted the evidence showing the accrual capital account's value nearest in time to the hearing rather than at separation.

The trial court granted wife's motion for alternate valuation date for the PDP account and valued it at $711,557.98. The trial court arrived at that valuation by first adding the entire $346,555.78 October 2018 distribution to the $636,336.28 in the account as of the July 1, 2018 separation. The trial court stated, "[T]hat amount is found by the [c]ourt to be marital and included in the value of the account which gives the account a total amount of $982,892.06." Nonetheless, the trial court further calculated that "from that total, the amount of $200,000.00 used to pay off the mortgage on the [marital] residence as well as $125,852.00 of transfers from marital expenses is backed out or subtracted from that amount leaving a value of $657,040.06." As a final measure, the trial court then "add[ed] in the amount of $54,517.92 to account for the interest that would have been earned if those funds [had been left] in the PDP account."

The trial court concluded that it did "not need to find a present day value" for the retirement plan, but nonetheless calculated "[t]he marital component of this plan . . . by applying the fraction of 144 months divided by the total number of months that [husband] is a partner from July 1, 2016, through the date of his retirement." The trial court noted that "both parties have raised . . . how to address the taxes associated when these funds are received." The trial court concluded that "to account for taxes at this point [is] speculative at best." Although it recognized that "the payments from this plan will be a taxable event," the trial court found that it did "not have sufficient evidence of what the applicable tax rates will be when these funds are paid out."

The trial court then distributed the parties' property. The trial court awarded wife "one half of the value of [husband's PWC] ownership interest in the amount of $217,292.50." Deeming wife's $355,778.99 share of the PDP account "a partial set off of the value that she will receive in the marital home[,]" the trial court awarded husband the PDP account "in its entirety."

The trial court determined that the pension "will be distributed via the deferred distribution method." The trial court more specifically ruled that wife "shall receive 50 percent of the marital share," which it "defined as 144 months over a total number of months that [husband] is a partner." In making its decision, the trial court noted that "both parties have raised . . . the issue of how to address the taxes associated when these funds are received[,]" but concluded that, while there was "no doubt that the payments from this plan will be a taxable event," there was not "sufficient evidence of what the applicable tax rates will be when these funds are paid out . . . to account for taxes at this point . . . ." Finding the issue "speculative at best[,]" the trial court declined to "make any adjustment . . . as suggested by [husband]."

The parties were awarded their respective life insurance policies, but "[t]o equalize the value of the life insurance policies," the trial court granted wife a monetary award of $64,977. In addition, after awarding wife $12,000 monthly spousal support for a period of ten years, the trial court, "[a]s a

security for that amount," directed husband "to list [wife] as the beneficiary on the $1,000,000.00 life insurance policy in a percentage sufficient to cover his outstanding spousal support obligation over the life of the award to $1,440,000.00 in support over the next decade." The trial court explained that it was doing so "because the life insurance policy is designed to ensure spousal support in the event of the paying spouse's death."

The trial court then addressed wife's request for attorney fees. The trial court found that, at the time of trial, husband's legal expenses were over $150,000 while wife's were almost $300,000. The trial court noted that it "took into consideration the positions taken during . . . the litigation of both parties regarding support, the classification and postseparation assets and their efforts to try to resolve this matter without litigation as well as whether or not either party has unnecessarily frustrated the litigation process." Based on its consideration of "all of the equities of the case," the trial court directed husband to pay $75,000 towards wife's attorney fees.

Husband filed a motion to reconsider and a separate list of objections to the trial court's ruling. In his motion to reconsider, he asked the trial court to reevaluate "the character, value and division of [his partnership] interest and to account for the taxes [he] will pay on the accrual capital account portion of that ownership interest upon his retirement." He also asked the trial court to reverse its decisions to grant wife's motion to alternately value the PDP account, to include interest in its calculation, and to divide equally his pension in light of the future tax burden he alone would bear. He also sought reconsideration of the award of attorney fees to wife. Husband further objected to the trial court "ordering him to name . . . [w]ife as a beneficiary" of the MassMutual life insurance policy.

Without conducting another hearing, the trial court addressed the issues husband raised with respect to its "calculation of certain retirement accounts, classification of ownership interest in certain properties, and granting of attorney's fees."

- 11 -

With respect to the value of husband's ownership interest, the trial court explained that, with no motion for an alternate date made by husband, it had valued the ownership interest as of the date of the evidentiary hearing. The trial court also rejected husband's tax-consequence argument, again finding the issue of future taxes too speculative.

In addressing the PDP account, the trial court first set forth the law regarding the classification of property for equitable distribution purposes, particularly with respect to "comingled" property. The trial court then recounted that it granted wife's motion to use an alternative valuation date and used the parties' July 1, 2018 separation date and also "considered the 2018 distribution of $346,555.78 that was added in October of 2018." The trial court explained that it "found good cause to use an alternative valuation date based on [husband's] multiple [post-separation] withdrawals . . . totaling nearly $1 million." In addition, the trial court determined that husband "failed to meet his burden under [Code §] 20-107.3(A)(3)(a)" whereby he "was required to show by a preponderance of the evidence that the separate contributions made to the PDP account could be traced back as separate property and not transmuted." Instead, the trial court agreed with "[wife's] expert on how there was no way to accurately determine which transfers from the PDP account were solely attributable to [husband's] separate funds." The trial court also rejected husband's argument based on the parties' collaboration agreement; it found that "nothing in the agreement seems to inhibit or modify any of [wife's] rights to property[.]"

Turning to husband's pension, the trial court stated that it had "properly considered the tax consequences to each party before making its award" and reiterated that, "while there is no doubt that the payment from this pension plan will trigger a taxable event, [it] lack[ed] sufficient evidence of what those tax rates would be." Finally, the trial court declined to reconsider its award of attorney fees, noting that it had considered the parties' relative financial positions. The trial court expressed that it found the fees claimed in wife's affidavit reasonable, and as such, "[i]n light of the

stark contrast between the parties' income levels, the parties' efforts to resolve this matter without litigation and whether one party unnecessarily frustrated the litigation process, the [c]ourt ordered [husband] to pay $75,000 out of the almost $300,000 of [wife's] attorney's fees and costs."  In denying husband's motion to reconsider the fee award, the trial court cited Code § 16.1-278.19, stating that it "permits the court to make an award of attorney's fees and costs on behalf of either party as the court deems appropriate based on the financial ability of the parties and any other factors the court considers to attain equity."

Without specifically addressing husband's objection to its ruling directing husband to designate wife as a beneficiary of the MassMutual life insurance policy, the trial court entered an order denying husband's motion to reconsider in its entirety.  The trial court then entered a final decree memorializing and incorporating its earlier rulings.[3]  Husband appeals to this Court, assigning error to the trial court's valuation and distribution of his PWC ownership interest, its distribution of his pension, its valuation and distribution of the PDP account, its direction that he name wife as a beneficiary of the MassMutual life insurance policy, and its award of attorney fees to wife.

## ANALYSIS

### I.  Standard of review

"[A]ll trial court rulings come to an appellate court with a presumption of correctness." *Wynnycky v. Kozel*, 71 Va. App. 177, 192 (2019) (quoting *Stiles v. Stiles*, 48 Va. App. 449, 453 (2006)).  "Because making an equitable distribution award is often a difficult task, 'we rely heavily on the discretion of the trial judge in weighing the many considerations and circumstances that are presented in each case.'"  *Howell v. Howell*, 31 Va. App. 332, 350 (2000) (internal quotation marks

---

[3] An initial final decree was entered on March 1, 2021, but the trial court suspended it to entertain husband's motion to reconsider.

omitted) (quoting *Moran v. Moran*, 29 Va. App. 408, 417 (1999)). Accordingly, "a circuit court's 'equitable distribution award will not be overturned unless the [appellate court] finds an abuse of discretion, misapplication or wrongful application of the equitable distribution statute, or lack of evidence to support the award.'" *Dixon v. Dixon*, 71 Va. App. 709, 717-18 (2020) (alteration in original) (internal quotation marks omitted) (quoting *Anthony v. Skolnick-Lozano*, 63 Va. App. 76, 83 (2014)). "It is well established that the trier of fact ascertains a witness' credibility, determines the weight to be given to their testimony, and has the discretion to accept or reject any of the witness' testimony." *Anderson v. Anderson*, 29 Va. App. 673, 686 (1999) (quoting *Street v. Street*, 25 Va. App. 380, 387 (1997) (*en banc*)). "In challenging the court's decision on appeal, the party seeking reversal bears the burden to demonstrate error on the part of the trial court." *Barker v. Barker*, 27 Va. App. 519, 535 (1998).

## II. Valuation and distribution of husband's ownership interest in PWC

Husband asserts the trial court committed multiple errors in its valuation and distribution of his ownership interest in PWC. In his first assignment of error, husband argues that the trial court erred when "valuing the marital portion of [his] accrual capital account" because it did not "account for [his] post-separation accrued income contributions to the account." Because the trial court's valuation of the accrual capital account was but a component part of the trial court's distribution of husband's ownership interest in PWC, husband's argument conflates distinct, but interrelated, concepts of equitable distribution: valuation and classification.

The equitable distribution process is governed by Code § 20-107.3, which requires a trial court to classify, value, and distribute property. As we previously have explained,

> There are three basic steps that a trial judge must follow in making equitable distribution of property. "The court first must classify the property as either [separate, marital, or part separate and part marital property]. The court then must assign a value to the property based upon evidence presented by both parties. Finally, the

- 14 -

court distributes the property to the parties, taking into consideration the factors presented in Code § 20-107.3(E)."

*Fox v. Fox*, 61 Va. App. 185, 193 (2012) (alteration in original) (quoting *Marion v. Marion*, 11 Va. App. 659, 665 (1991)).

Here, the evidence established that husband's accrual capital account was a constituent part of his ownership interest in PWC. The trial court determined that husband's ownership interest in PWC was "hybrid property" and was composed "of [h]usband's deposit capital account and his accrual capital account with P[W]C, and an outstanding loan." Husband does not dispute that his ownership interest in PWC constituted hybrid property or that it was composed of the constituent parts identified by the trial court.

Having determined that husband's ownership interest in PWC was hybrid property, and thus, subject to equitable distribution, the trial court was required to value the ownership interest. Specifically, although allowing a different valuation date to be utilized "[u]pon motion of either party made no less than 21 days before the evidentiary hearing . . . for good cause shown, in order to attain the ends of justice," Code § 20-107.3(A) directed the trial court to "determine the value of any such property as of the date of the evidentiary hearing on the evaluation issue." The trial court did so based on the evidence presented and concluded that, as of the date of the evidentiary hearing, the "marital share value of [h]usband's P[W]C Ownership interest [was] $434,485."

As he does on appeal, husband argued in a motion to reconsider in the trial court that the trial court overvalued the marital share because it did so "as of July 1, 2019 – one year after the separation[, and thus, included funds that were] earned post-separation[.]" In essence, husband argues that the trial court committed a classification error in that valuing the property as of the evidentiary hearing caused the account to include funds that otherwise would have been his separate property.

- 15 -

In rejecting husband's motion to reconsider, the trial court explained its reasoning and the statutory authority for the actions it took. Specifically, the trial court noted that it had

> properly valued [husband]'s ownership interest in P[W]C. At the date of the hearing the current value of [husband]'s ownership interest was $434,485.00. [Code §] 20-107.3(A) permits the [c]ourt to determine the value of property as of the date of the evidentiary hearing on such issue. . . . [Husband] failed to make a request that an alternate valuation date be used to determine the value of his P[W]C ownership interest and is therefore precluded from doing so now.

We find no error in the trial court's resolution of the issue. The trial court correctly determined that there was a marital component of husband's ownership interest in PWC and appropriately "determine[d] the value of any such property as of the date of the evidentiary hearing" as directed by Code § 20-107.3(A). To the extent that husband believed that using the date of the evidentiary hearing artificially inflated the marital share of his ownership interest by including what otherwise would be separate property in the valuation, it was incumbent upon him to file a motion twenty-one days before the hearing seeking an alternate valuation date. He did not do so. Accordingly, the trial court did not commit reversible error in valuing husband's ownership interest in PWC as of the date of the evidentiary hearing.

In his second assignment of error, husband argues that the trial court also erred regarding the value of the marital share of his ownership interest in PWC "by not appropriately considering the tax consequences to the parties in the equitable distribution of this asset." Specifically, he contends that because he will be liable for taxes on the entirety of his ownership interest when he receives payment for it from PWC, the trial court was required, as a matter of law, to reduce wife's share of the asset by some amount. We disagree.

As husband notes, in fashioning an equitable distribution award, a trial court is required to consider the tax consequences the parties will face in light of the award. *See* Code § 20-107.3(E)(9). Such consideration, however, does not require a trial court to reach a

- 16 -

particular result or to reduce the award in light of the taxes that will be paid, at some point, by one of the parties. As we previously have explained,

> Code § 20-107.3(E)(9) . . . does not mandate that a trial court reduce an award for potential . . . tax consequences no matter how certain or uncertain they may be. Subsection E(9) requires only that the trial court *consider* tax consequences when formulating an equitable distribution award. What weight, if any, to assign to this factor in the overall decision lies within the trial court's sound discretion. Under settled law, "the trial court *must* consider each of the statutory factors, but *may* determine what weight to assign to each of them."

*Owens v. Owens*, 41 Va. App. 844, 859 (2003) (quoting *Thomas v. Thomas*, 40 Va. App. 639, 644 (2003)).

Here, as husband conceded at oral argument in this Court, the trial court considered the tax consequences to the parties of its award. In response to husband's argument that future taxes that he ultimately will pay should reduce wife's portion of the marital share of his ownership interest in PWC, the trial court expressly stated that it had considered the evidence offered regarding the tax consequences. The trial court explained that, although it recognized that PWC's payment to husband for his ownership interest would be a taxable event at some point in the future, there were too many uncertainties for the trial court to calculate with sufficient precision the ultimate effect. Because the date the payment will be made and the tax rates that will be in place at that time were unknown, the trial court concluded that "the tax consequences are too speculative . . . to reduce [the] award" to wife. Such a conclusion is consistent with our decision in *Owens* and certainly falls well within the bounds of the trial court's considerable discretion. Accordingly, the trial court did not fail to "appropriately consider[] the tax consequences" in distributing the marital share of husband's ownership interest in PWC as asserted by husband.

Having concluded that the trial court did not abuse its discretion in the valuation, classification, or distribution of the marital share of husband's ownership interest in PWC, we affirm that portion of the trial court's judgment.

### III. Distribution of husband's pension

Husband next contends that the trial court erred in awarding wife half of the marital share of his pension. Specifically, much as he argues regarding the distribution of his ownership interest in PWC, husband argues that the trial court erred in the distribution of the marital share of his pension, contending the trial court failed "to account for the fact that Husband will bear 100 percent of the taxes on the pension payments."

The evidence established that PWC had a pension plan in which husband participated and that PWC's pension program was not an ERISA plan, but rather, had been established by PWC as a "non-qualified" retirement plan. As a result of this decision by PWC, the plan was not subject to division by way of a QDRO, meaning that, when the pension benefits eventually are paid out, all of them must be paid first to husband. Consequently, husband will be required to pay taxes on the entire amount of the payments even though some portion of the payments will represent wife's interest in the marital share of the pension. It is undisputed that a portion of husband's pension, the marital share, was subject to equitable distribution.

A trial court's division of a pension is governed by Code § 20-107.3(G)(1), which provides that a trial court

> may direct payment of a percentage of the marital share of any
> pension, . . . or retirement benefits, whether vested or nonvested,
> which constitutes marital property and whether payable in a lump
> sum or over a period of time. The court may order direct payment of
> such percentage of the marital share by . . . [the] holder of the
> benefits. However, the court shall only direct that payment be made
> as such benefits are payable. No such payment shall exceed 50
> percent of the marital share of the cash benefits actually received by
> the party against whom such award is made. "Marital share" means

> that portion of the total interest, the right to which was earned during the marriage and before the last separation of the parties . . . .

In ordering the division and distribution of a pension, a trial court's award must be based "upon consideration of the factors set forth in subsection E[,]" Code § 20-107.3(G), which requires consideration of "[t]he tax consequences to each party[,]" Code § 20-107.3(E)(9).

Based on the evidence, the trial court determined the marital share of the pension, and husband does not challenge that calculation. Consistent with the provisions of Code § 20-107.3(G)(1), the trial court awarded wife half of the marital share to be paid by husband if and when he receives the pension payments from PWC. Husband contends this was error because of the taxes he will be required to pay.

Much as with the division of husband's ownership interest in PWC, the trial court was required to consider the tax implications of its award. Code § 20-107.3(E)(9). Once again, the record makes clear that the trial court, in fact, did consider taxes in rendering its award. The trial court expressly stated that it had done so. In addressing husband's specific argument that, at some point in the future he would bear the entirety of the tax burden, and therefore, the trial court should adjust the division of the marital share accordingly, the trial court explained that, although "there is no doubt that the payment from this pension plan will trigger a taxable event" in the future, it "lack[ed] sufficient evidence of what those tax rates would be" to craft what it believed would be an equitable adjustment to the 50-50 division it found proper.

As with husband's ownership interest in PWC, the statutory scheme required the trial court to consider the tax consequences of its award, not reach a particular result. *Cf. Owens*, 41 Va. App. at 859. The fact that PWC, husband's employer, has structured its retirement plan such that husband is responsible for paying taxes on 100% of the marital share even if he receives only 50% of the marital share was something the trial court had to consider, but it did not require that the

- 19 -

trial court grant husband the relief he sought or reduce wife's portion of the marital share by any specific amount.

Although a reasonable jurist could have ordered such an adjustment, the considered decision of the trial court not to do so in this case does not constitute an abuse of discretion. *See Hamad v. Hamad*, 61 Va. App. 593, 607 (2013) ("An abuse of discretion occurs only when 'reasonable jurists' could not disagree as to the proper decision. This principle necessarily implies that, for some decisions, conscientious jurists could reach different conclusions based on exactly the same facts—yet still remain entirely reasonable." (internal citation omitted)). Having concluded that the trial court did not abuse its discretion in the distribution of the marital share of husband's pension, we affirm that portion of the trial court's judgment.

IV. Valuation and distribution of the PDP account

Husband next assigns error to the trial court's granting of wife's motion to select an alternative valuation date for his PDP account. He contends the trial court abused its discretion because it first did not find that husband had wasted any of the funds or otherwise find good cause justifying an alternate date. He also argues that the motion should not have been granted in light of the parties' collaborative agreement. Finally, he contends the trial court erred in including in its ultimate distribution of the asset an interest award designed to account for husband's transfer of funds from the PDP account.

"On appeal, we review the [trial] court's determination of a valuation date for abuse of discretion." *Wright v. Wright*, 61 Va. App. 432, 463 (2013) (quoting *Thomas*, 40 Va. App. at 647). As noted above, Code § 20-107.3(A), directs trial courts to value marital assets as of the date of the evidentiary hearing, but allows a different date to be used "[u]pon motion of either party made no less than 21 days before the evidentiary hearing . . . for good cause shown, in order to attain the ends of justice[.]" Such "[a] good cause determination invests a trial court with discretion[,]"

- 20 -

*Wright*, 61 Va. App. at 466 (quoting *AME Fin. Corp. v. Kiritsis*, 281 Va. 384, 392 (2011)), and thus, we will disturb that determination only if it is not "supported by evidence in the record[,]" *id.* (quoting *Stephens v. Commonwealth*, 274 Va. 157, 163 (2007)).

PWC deposited work income earned by husband during the marriage into the PDP account, and the parties agree that, as of the date of separation, the PDP account was marital property. *See Gilliam v. McGrady*, 279 Va. 703, 708 (2010) (recognizing that Code § 20-107.3(A)(2) creates "a presumption that all property acquired by either spouse during marriage is marital property"). Post-separation, PWC continued to deposit husband's income from employment into the PDP account. Normally, income earned post-separation is considered separate property. *Dietz v. Dietz*, 17 Va. App. 203, 212-13 (1993) (recognizing that wages earned after the date of last separation are not earned during the marriage, and thus, are separate property under Code § 20-107.3).[4] Husband, who could not write checks on the PDP account, would then transfer funds from the PDP account to separate accounts to allow him to write checks.

Husband's first contention, that the trial court never found "good cause" to support an alternative valuation date of the PDP account is belied by the trial court's April 27, 2021 order. The trial court expressly stated that it had "*found good cause* to use an alternative valuation date based on [husband]'s multiple withdrawals from the PDP account to his personal account,

---

[4] The trial court found that the deposit of husband's post-separation wages into the PDP account that, pre-separation, contained marital property, represented a commingling of separate property with marital property. *See* Code § 20-107.3(A)(3)(d) ("When marital property and separate property are commingled by contributing one category of property to another, resulting in the loss of identity of the contributed property, the classification of the contributed property shall be transmuted to the category of property receiving the contribution."). The trial court then concluded that the post-separation deposits to the PDP account were transmuted to marital property because, once deposited, the funds were not "retraceable." *Id.* Husband does not challenge this portion of the trial court's ruling, stating on brief that his presentation of evidence and argument regarding "the use of marital funds was not an attempt to trace separate property for classification purposes, but to provide support for [h]usband's argument that granting [w]ife's motion to alternately value the PDP account was an abuse of discretion."

totaling nearly $1 million." (Emphasis added). Clearly, contrary to husband's assertion on brief, the trial court found good cause for use of an alternative valuation date.

Although the fact that husband transferred what were marital funds, *see* fn. 4 *supra*, to a personal account was sufficient to support the trial court's finding of good cause, *see Smith v. Smith*, 18 Va. App. 427, 430 (1994), the trial court did not end its inquiry there. Instead of simply dividing the PDP account as of the alternative valuation date, the trial court sought to determine the reasons for which husband had transferred the marital funds from the PDP account. As we noted in *Clements v. Clements*, 10 Va. App. 580, 586 (1990), a case heavily relied upon by both husband and wife, "[o]nce the aggrieved spouse shows that marital funds were either withdrawn or used after the breakdown, the burden rests with the party charged with dissipation to prove that the money was spent for a proper purpose." Husband's burden on this issue was both the burden of production and the burden of persuasion. *See SunTrust Bank v. PS Bus. Parks, L.P.*, 292 Va. 644, 652 (2016) (defining "the 'burden of production[]'" as "the obligation to come forward with evidence to make a prima facie case" and "the 'burden of persuasion[]'" as "the obligation to introduce evidence that actually persuades the fact finder to the requisite degree of belief that a particular proposition of fact is true" (quoting Charles E. Friend & Kent Sinclair, *The Law of Evidence in Virginia* § 5-1[a], at 298 (7th ed. 2012))).

Husband's essential contention is that, if all of the funds he removed from the PDP account between the separation and the evidentiary hearing were spent for proper, marital purposes, it was an abuse of discretion for the trial court to use a valuation date for the PDP account other than the evidentiary hearing. Husband points to testimonial, documentary, and demonstrative evidence he adduced and argues that this was more than sufficient to satisfy his burden of proving that all funds he removed from the PDP account between the separation and the evidentiary hearing were spent for proper, marital purposes.

Although husband met his burden of producing evidence on the issue, the trial court was not required to find that evidence persuasive. The trial court was required to consider and weigh husband's evidence in light of all of the evidence. It clearly did so, crediting much of husband's evidence, but not all of it. In rejecting the totality of husband's claims, the trial court found that, due to the commingling of marital and non-marital assets, husband had not established that portions of the PDP account funds had not been used for husband's personal benefit as opposed to a marital purpose. As a result, it adjusted its division of the PDP account to credit husband for the post-separation withdrawals that husband had proven to the trial court's satisfaction were for marital purposes, but not for the withdrawals for which husband failed to persuade the trial court.

In seeking to have us reverse the trial court's findings regarding these amounts, husband misunderstands our role. Unlike the trial court, we are not the factfinder. We do not revaluate and reweigh the evidence because "[t]he credibility of the witnesses and the weight accorded the evidence are matters solely for the [the trial court, which] has the opportunity to see and hear that evidence as it is presented." *Budnick v. Budnick*, 42 Va. App. 823, 834 (2004) (citation omitted). Here, husband was able to persuade the trial court that some of the marital funds he withdrew from the PDP account post-separation went for proper, marital purposes. Given our deference to the factfinder, we cannot say the trial court erred in this regard even if we would have reached a different conclusion if tasked with considering the question as an initial matter.

Husband's argument that the trial court abused its discretion in selecting an alternative valuation date for the PDP account because doing so runs afoul of the parties' collaborative agreement fares no better. Although husband correctly points out that Paragraph 6 of the collaborative agreement effectively required him to "maintain[] the status quo regarding the finances and payment of expenses post-separation pursuant to the parties' agreement, as he did during the marriage[,]" nothing in Paragraph 6 or any other provision of the agreement precluded

- 23 -

the trial court from utilizing an alternative valuation date or required it to accept as fact that all of husband's post-separation withdrawals from an account containing marital funds were spent for proper purposes. Accordingly, husband's argument that the collaborative agreement precluded the trial court from using an alternative valuation date is without merit.

Husband also asserts that the trial court erred in its award regarding the PDP account by including "speculative" interest that would have been earned had husband not transferred money from the PDP account to his personal accounts.[5] Husband contends that the award of such interest is inconsistent with the trial court's authority to adopt an alternative valuation date because, by definition, the interest awarded was never in the account on any date, let alone the alternative valuation date the trial court selected.[6]

The trial court noted that, in making its award regarding the PDP account it had "added the amount of $54,517.92 to the account for the interest that would have been earned if funds had not been withdrawn from the PDP account" by husband and transferred to his personal accounts. Husband's argument that this was improper conflates the trial court's selection of an alternative valuation date to begin the division process with its equitable powers regarding the ultimate division of marital assets. From the record, it appears that the trial court granted wife's motion for an alternate valuation date for the account to begin its analysis. Having done so, the trial

_____

[5] Husband's assignment of error challenges only the power of the trial court to have included interest in its award and not the evidentiary basis for the award or the method by which the trial court calculated the amount of interest. Accordingly, our review is limited to the ability of the trial court to include an interest component at all and not the specific interest awarded.

[6] Wife notes that in *Pliuskaitis v. Pliuskaitis*, No 0423-13-4 (Va. Ct. App. Oct. 8, 2013), an unpublished decision, a panel of this Court affirmed a trial court's use of an alternative valuation date for a marital account based on dissipation and its subsequent award of interest to account for amounts that would have been earned but for the dissipation. Because unpublished decisions are never more than persuasive authority, *see* Rule 5A:1(f), and it does not appear that the panel directly addressed the propriety of such an interest award because it was not asked to address that specific question, we do not rely on the decision in *Pliuskaitis* in resolving this question.

- 24 -

court then applied the relevant factors for equitable distribution, *see* Code § 20-107.3, to its award of all the marital property, including the PDP account. In seeking to achieve an *equitable* distribution of the property, these factors allowed the trial court, as a matter of *equity*, to account for husband's transfer of funds from the marital PDP account by increasing the award to wife to allow for interest that would have been earned but for husband's effective conversion of the marital assets. In short, the interest award was to compensate wife for amounts the trial court concluded husband inappropriately had removed from the account over time. Although nothing in the statutory scheme required the trial court to take such an action and a reasonable jurist could have declined to do so, we cannot say that, in light of the entire record, the trial court abused its discretion in doing so here.

Having concluded that the trial court did not abuse its discretion in either the granting of wife's motion for an alternative valuation date of the PDP account or in its award of interest to compensate wife for husband's inappropriate transfer of funds from the PDP account, we affirm the trial court's judgment regarding the PDP account.

V. Designation of wife as beneficiary of husband's MassMutual life insurance policy

Regarding husband's MassMutual life insurance policy, the trial court distributed some of the cash value of the policy to wife as part of its equitable distribution of the marital estate and ordered husband to name wife as the beneficiary of the policy to help ensure that wife would receive the benefits of the trial court's award of spousal support even if husband were to die. Husband argues that, because the evidence showed that the family trust, rather than wife, was the named beneficiary of the policy during the marriage, the trial court was without authority to order him to designate wife as a beneficiary going forward. Wife responds that, although the policy named the trust as the beneficiary, she is a beneficiary of the trust. She reasons that it was the "intent" of the parties that she benefit from the policy during the marriage, and thus, the purposes of

Code § 20-107.1:1(A) are served by allowing the trial court to order husband to name her the beneficiary of the policy going forward even though she was not the named beneficiary during the marriage.

Although we review a trial court's equitable distribution and spousal support under the deferential abuse of discretion standard, *Dixon*, 71 Va. App. at 717-18 (equitable distribution); *Chaney v. Karabaic-Chaney*, 71 Va. App. 431, 435 (2020) (spousal support), a trial court definitionally abuses its discretion when it commits an error of law, *Giraldi v. Giraldi*, 64 Va. App. 676, 682 (2015). Whether a trial court committed an error of law in its interpretation of a statute related to equitable distribution or spousal support presents a question of law subject to *de novo* review on appeal. *David v. David*, 287 Va. 231, 237 (2014).

In addressing questions of statutory interpretation, "our primary objective is 'to ascertain and give effect to legislative intent,' as expressed by the language used in the statute." *Cuccinelli v. Rector & Visitors of the Univ. of Va.*, 283 Va. 420, 425 (2012) (internal quotation marks omitted) (quoting *Commonwealth v. Amerson*, 281 Va. 414, 418 (2011)). "[W]e determine the General Assembly's intent from the words contained in the statute." *Williams v. Commonwealth*, 265 Va. 268, 271 (2003) (citing *Vaughn, Inc. v. Beck*, 262 Va. 673, 677 (2001); *Thomas v. Commonwealth*, 256 Va. 38, 41 (1998)). Absent an ambiguity or an obvious absurdity, "words in a statute are to be construed according to their ordinary meaning, given the context in which they are used." *City of Va. Beach v. Bd. of Supvrs.*, 246 Va. 233, 236 (1993) (quoting *Grant v. Commonwealth*, 223 Va. 680, 684 (1982)).

Pursuant to Code § 20-107.3(G)(2), a trial court "may order a party to designate a spouse or former spouse as irrevocable beneficiary during the lifetime of the beneficiary of all or a portion of any survivor benefit . . . , to include a life insurance policy . . . [as] permitted by § 20-107.1:1."

Code § 20-107.1:1(A), in turn, provides that in cases where spousal support has been awarded, the trial court

> may order a party to (a) maintain any existing life insurance policy on the insured party's life that was purchased during the marriage . . . *provided that . . . the payee has been designated as a beneficiary of such policy during the marriage* . . . ; (b) designate the other party as beneficiary of all or a portion of the death benefit of such life insurance for so long as the insured party so ordered has an obligation to pay spousal support to the other party, *provided that . . . the payee has been designated as a beneficiary of such policy during the marriage* . . . .

(Emphasis added).

As the plain language of the statute makes clear, a trial court is authorized to order that a divorcing spouse designate the former spouse as a beneficiary on a life insurance policy if two conditions are met. First, the life insurance policy must already be in existence for the statute authorizes the trial court to order the party to "maintain an[] existing life insurance policy on the insured party's life that was purchased during the marriage[.]" Code § 20-107.1:1(A)(a); *cf. Mills v. Mills*, 70 Va. App. 362, 376 (2019) (recognizing in the context of a property settlement agreement that a duty to maintain an insurance policy presupposes an existing policy because "'maintain' means 'to keep in a state of repair, efficiency, or validity: preserve from failure or decline'" (citation omitted)). Additionally, the trial court may order that the payee spouse be designated the beneficiary only if the "*the payee has been designated as a beneficiary of such policy during the marriage*[.]" Code § 20-107.1:1(A) (emphasis added).

It is undisputed that wife has never been designated the beneficiary of the MassMutual policy, and thus, does not fall within the plain language of the statute. Recognizing this, wife invites us to look beyond the express language of the statute and of the beneficiary designation during the marriage. She reasons that, as a beneficiary of the family trust, she was an intended beneficiary of the policy even though she is not the named beneficiary on the policy. She argues that because she

falls outside the scope of the statute only in a technical sense, the trial court should have had the power to order husband to name her the beneficiary of the MassMutual policy going forward.

The flaw in this extratextual argument is that entitlement to many legal benefits (and the imposition of many legal obligations) often turn on what some refer to as "technicalities." Here, the parties were sophisticated and made a conscious decision at the beginning of their marriage to structure their affairs so no individual was named as a beneficiary of their respective life insurance policies. Presumably, they made this choice because doing so provided some perceived tax, probate, or other estate planning benefit. In short, the parties, including wife, sought the benefit of the "technicality" of naming the trust as opposed to a person as the beneficiary of the life insurance policy.

In this instance, whatever benefit wife gained from the "technicality" of the trust being named the beneficiary of the policy came with a cost. It placed the policy outside of the scope of Code § 20-107.1:1(A), and thus, the trial court was without authority to order husband to name her as a beneficiary on the MassMutual life insurance policy going forward. Accordingly, we reverse this portion of the trial court's judgment and remand the matter for the purpose of entry of an order relieving husband of any obligation to name wife the beneficiary of his MassMutual life insurance policy going forward.[7]

VI. Award of attorney fees to wife for costs incurred prior to the appeal

Husband assigns error to the trial court awarding wife $75,000 for attorney fees and costs she incurred below. He asserts the award was "unreasonable under all of the circumstances

---

[7] As noted above, in a separate portion of its ruling, the trial court considered the parties' property interests in the cash value of the respective life insurance policies and divided those interests as part of its equitable distribution award. As a result, our ruling does not affect the trial court's equitable distribution award. Accordingly, as the parties agreed at oral argument in this Court, our reversal of the trial court on this point does not necessitate reopening the trial court's decisions regarding equitable distribution or spousal support.

revealed in the record." Although the award was part of the trial court's initial March 1, 2021 order, husband notes that in its April 27, 2021 order addressing husband's motion for reconsideration, the trial court cited "Code § 16.1-278.19, which is a statute pertaining to matters in the Virginia Juvenile and Domestic Relations District Court" in explaining its award of attorney fees to wife.

As husband notes on brief, the award by a trial court of attorney fees and costs in a divorce case is authorized by Code § 20-79(b) (allowing for an award of "counsel fees and other costs, if in the judgment of the court any . . . should be so decreed") and Code § 20-99(6) (providing that in suits for divorce "[c]osts may be awarded to either party as equity and justice may require"). We previously have noted that these statutes "provide the statutory basis for the broad discretionary authority circuit courts have to award attorney's fees and other costs as the equities of a divorce case . . . may require." *Tyszcenko v. Donatelli*, 53 Va. App. 209, 222 (2008). Accordingly, we review a trial court's decision to award attorney fees incurred prior to an appeal under the deferential abuse of discretion standard. *Budnick*, 42 Va. App. at 844.

A trial court may make an award of attorney fees in a divorce action only after "considering 'the circumstances of the parties' and 'the equities of the entire case,'" and its ultimate award must be "reasonable 'under all of the circumstances revealed by the record.'" *Mayer v. Corso-Mayer*, 62 Va. App. 713, 734 (2014) (quoting *Tyszcenko*, 53 Va. App. at 223); *see also Conley v. Bonasera*, 72 Va. App. 337, 350 (2020). A review of the record here reveals that the trial court considered the relevant circumstances and that its ultimate award was reasonable. As it explained, the trial court's award was based on its "consideration [of] the positions taken during . . . the litigation of both parties regarding support, the classification and postseparation assets and their efforts to try to resolve this matter without litigation as well as whether or not either party has unnecessarily frustrated the litigation process" as well as "all of the equities of the case[.]"

- 29 -

The parties were dealing with a significant marital estate and engaged in a lengthy process that included both a collaborative process that helped resolve many issues and litigation for the numerous issues that could not be resolved by agreement. Both parties engaged capable and experienced counsel who came at significant expense with wife spending nearly $300,000 on counsel through the trial court proceedings and husband spending in excess of $150,000 on counsel over the same period. In ordering husband to pay $75,000 of wife's attorney fees, the trial court essentially divided the total counsel fees incurred by the parties evenly among them. Given the deferential standard of review and the fact that husband has significantly more earning power going forward, we cannot say that the trial court abused its discretion in doing so.

That the trial court erroneously cited to Code § 16.1-278.19 in denying husband's motion for reconsideration does not dictate a different result. Although husband correctly points out that the cited statute only applies to proceedings in the juvenile and domestic relations district courts, the statute creates a discretionary attorney fees regime, authorizing awards of attorney fees "as the court deems appropriate based on the relative financial ability of the parties and any other relevant factors to attain equity." Code § 16.1-278.19. In short, despite differences in the precise statutory language used, the basis for a discretionary award of attorney fees under Code § 16.1-278.19 is essentially indistinguishable from the basis for a discretionary award of attorney fees under Code §§ 20-79(b) and 20-99(6) as we have interpreted those statutes.[8] Thus,

---

[8] The fact that the statutes at issue create virtually indistinguishable regimes of discretionary awards of attorney fees distinguishes this case from *Tyszcenko*. In *Tyszcenko*, we reversed a trial court's award of attorney fees because it erroneously had based its award on Code § 20-146.33(A). 53 Va. App. at 221. Although we found that Code §§ 20-79(b) and 20-99(6) allowed for an attorney fee award in that case, we declined to utilize those statutes to affirm the trial court's award based upon Code § 20-146.33(A) because that statute, when applicable, mandated that the trial court award fees to the prevailing party as opposed to granting it the discretion to do so. Because Code § 16.1-278.19 authorizes discretionary attorney fee awards based on considerations identical to those applicable to Code §§ 20-79(b) and 20-99(6), the reasoning requiring reversal in *Tyszcenko* does not apply here.

the trial court's erroneous citation to Code § 16.1-278.19 is the very definition of harmless error. *See* Code § 8.01-678(2) ("When it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached, no judgment shall be arrested or reversed . . . [f]or any other defect, imperfection, or omission in the record, or for any error committed on the trial."). Accordingly, we affirm the trial court's judgment awarding wife $75,000 for attorney fees incurred prior to the appeal.

### VII. Attorney fees on appeal

Both parties request an award of attorney fees for the fees that each has incurred on appeal. Such awards are governed by Rule 5A:30. Rule 5A:30(b)(2) provides that "the Court of Appeals may award to a party who has made such request, all of their attorney fees, or any part thereof"). "In determining whether to make such an award, the Court of Appeals shall not be limited to a consideration of whether a party's position on an issue was frivolous or lacked substantial merit but shall consider all the equities of the case." Rule 5A:30(b)(3). Thus, unlike our review of attorney fee awards made by trial courts, the question of attorney fees on appeal is committed to our discretion based upon our consideration of all of the pertinent facts and circumstances. *Friedman v. Smith*, 68 Va. App. 529, 545 (2018).

Exercising our discretion, we deny both requests for attorney fees on appeal. The appeal involved significant issues and resulted in each party prevailing on at least one issue. The record, including the trial court's prior award of fees and its division of the marital estate, reflects that the parties have sufficient means to hire counsel to protect or assert their respective rights, and thus, equity does not demand that one side subsidize the appellate costs of the other. Given our view of the totality of the circumstances, no appellate attorney fee award is appropriate here.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court regarding its valuation and distribution of husband's ownership interest in PWC, its distribution of husband's pension, its valuation and distribution of the PDP account, and its award of attorney fees to wife for costs incurred prior to the appeal. We reverse the trial court's judgment regarding the requirement that husband name wife as a beneficiary of his MassMutual life insurance policy and remand the matter to the trial court for the sole purpose of entering an order relieving husband of any obligation to name wife the beneficiary of that policy going forward.

*Affirmed in part, reversed in part, and remanded.*